**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PACIFICORP, an Oregon business corporation,

*Plaintiff - Appellant*,

v.

CASEY SIXKILLER, Director of the Washington State Department of Ecology,

*Defendant - Appellee*.

No. 24-4803

D.C. No.
3:23-cv-06155-TMC

OPINION

Appeal from the United States District Court
for the Western District of Washington
Tiffany M. Cartwright, District Judge, Presiding

Argued and Submitted June 2, 2025
Seattle, Washington

Filed August 7, 2026

Before: Johnnie B. Rawlinson, Daniel A. Bress, and Patrick
J. Bumatay, Circuit Judges.

Opinion by Judge Rawlinson;
Dissent by Judge Bress

## SUMMARY[*]

### Dormant Commerce Clause

The panel affirmed 1) the district court's dismissal with prejudice of PacifiCorp's complaint alleging that the Washington State Department of Ecology violates the Dormant Commerce Clause through enforcement of decarbonization requirements under Washington's Climate Commitment Act (CCA), and 2) the district court's dismissal of PacifiCorp's motion for a preliminary injunction as moot.

Washington's Clean Energy Transformation Act (CETA) was adopted in 2019 to address the impacts of climate change by transitioning the state's electricity supply to one hundred percent carbon-neutral by 2030. In 2021, Washington adopted the CCA, requiring certain greenhouse-gas emitting entities located in Washington to obtain allowances for their annual greenhouse-gas emissions. The CCA contains a provision allowing electric utilities subject to CETA to be eligible for allowance allocation to mitigate the cost burden of the CETA program on electricity customers. Under the CCA, all electric utilities subject to the requirements of the CETA are eligible for no-cost allowances.

PacifiCorp, a multi-state utility that serves customers in six states and which is subject to CETA, receives no-cost allowances for carbon emissions produced by electricity sold to Washington customers, but does not receive no-cost allowances for emissions from electricity exported outside

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the state of Washington. PacifiCorp contends that enforcement of the decarbonization requirements under the CCA unconstitutionally increases electricity costs for PacifiCorp's non-Washington customers.

Agreeing with the district court that PacifiCorp has Article III standing and that PacifiCorp's claims are ripe, the panel held that the district court's dismissal of PacifiCorp's complaint with prejudice was warranted because PacifiCorp failed to plausibly allege that Washington's decarbonization regulations and its use of no-cost allowances were applied to similarly situated entities as required for violations of the Dormant Commerce Clause. The panel explained that because of the regulatory distinctions between the treatment of entities that produce in-state electricity and exported electricity under the CCA and CETA, PacifiCorp's exported power, which is not subject to CETA, it is not similarly situated to utilities providing in-state power under CETA.

The panel further held that because PacifiCorp is unable to plausibly allege a cognizable claim under the Dormant Commerce Clause, the district court did not err in dismissing PacifiCorp's complaint without leave to amend, and PacifiCorp's motion for preliminary injunction was correctly denied as moot.

Dissenting, Judge Bress wrote that the CCA facially discriminates against interstate commerce by imposing greater costs on interstate electricity sales through the disallowance of associated no-cost allowances. He wrote that because this case is only at the pleading stage, the proper course here is to remand this case for factual development as to whether CETA's compliance costs and the CCA allowances are "roughly equivalent" in a way that would

justify Washington's otherwise discriminatory treatment of interstate electricity sales.

---

## COUNSEL

Dallas S. DeLuca (argued), Paul S. Bierly, and Josephine C. Kovacs, Markowitz Herbold PC, Portland, Oregon, for Plaintiff-Appellant.

Christopher H. Reitz (argued) and Zachary S. Packer, Assistant Attorneys General; Andrew A. Fitz, Senior Assistant Attorney General; Kelly T. Wood, Senior Counsel; Nicholas W. Brown, Washington Attorney General; Office of the Washington Attorney General, Olympia, Washington; for Defendant-Appellee.

---

## OPINION

RAWLINSON, Circuit Judge:

PacifiCorp is a utility that supplies electricity to customers in Washington, Utah, Wyoming, Idaho, Oregon, and California. PacifiCorp appeals the district court's dismissal with prejudice of its complaint alleging that the Washington State Department of Ecology (Ecology) violates the Dormant Commerce Clause through enforcement of decarbonization requirements under Washington's Climate Commitment Act (CCA). *See* Wash. Rev. Code § 70A.65. PacifiCorp contends that this enforcement unconstitutionally increases electricity costs for PacifiCorp's non-Washington customers. PacifiCorp also challenges the district court's

dismissal of its motion for preliminary injunction as moot. We affirm.

## I.    <u>BACKGROUND</u>

PacifiCorp is "a multi-state utility that serves approximately two million customers in six states, with approximately 140,000 customers in Washington." In its amended complaint, PacifiCorp alleged that it "owns and operates the Chehalis Generation Facility (Chehalis), . . . a gas-fired combined cycle electric generation facility located south of Chehalis, Washington." In 2021, Washington enacted the CCA which "require[s] certain emitting entities located in Washington to obtain and retire allowances for their respective annual greenhouse-gas emissions." "Some entities covered by the CCA will purchase allowances for their respective emissions at auction, while others are provided free (no-cost) allowances for emitting generation that serves Washington utility customers." PacifiCorp alleged that "[t]hese no-cost allowances mitigate the costs for Washington utility customers who would otherwise be required to pay for CCA allowances at market prices." In contrast, emitting resources like Chehalis, which are located in Washington but serve utility customers in other states in addition to Washington, do not receive no-cost allowances for the portion of emissions for service for out-of-state residents." Under the CCA, "[t]hese no-cost allowances are assigned directly to electric utilities in an attempt to mitigate the cost burden of the program on electricity customers."

PacifiCorp further alleged that "[u]nder the CCA and its implementing regulations, electric utilities can transfer their no-cost allowances to the power plants that they own. Because these power plants are responsible for generating the electricity these utilities sell, and the emissions

associated with that electricity, these no-cost allowances eliminate some or all of a utility-owned power plants' compliance costs caused by the CCA." PacifiCorp alleged that "for emitting resources like Chehalis that are located in Washington but that serve customers both within Washington and in other states, PacifiCorp will not receive no-cost allowances for the portion of emissions for service for out-of-state residents." "As a result, PacifiCorp's non-Washington customers bear higher power costs to ensure Chehalis has sufficient allowances to cover its emissions for the energy that serves those customers." "Alternatively, if utility regulators in those other states deny recovery of the cost of allowances because of this disparate treatment, PacifiCorp shareholders will bear the CCA compliance costs simply because it serves customers in other states." PacifiCorp asserted that "Washington customers do not pay for CCA allowance costs for electricity generated at Chehalis, but PacifiCorp and PacifiCorp's out-of-state customers do. The CCA's allocation of no-cost allowances harms PacifiCorp's non-Washington customers and PacifiCorp in direct proportion to the amount of Chehalis generation that crosses Washington's border."

PacifiCorp alleged that "[t]his harm to PacifiCorp and its non-Washington customers will continue to increase because Chehalis incurs a new CCA compliance obligation for each metric ton of carbon dioxide equivalent that the plant emits," and "approximately 77 percent of Chehalis' emissions do not receive no-cost allowances, and it falls to PacifiCorp (an out-of-state entity) or its out-of-state customers to pay for Washington's CCA compliance costs." PacifiCorp further alleged that "[a]s applied to PacifiCorp and its out-of-state customers, [Ecology's] implementation of the CCA's allocation of no-cost allowances violates the

Commerce Clause of the United States Constitution because it impermissibly discriminates against out-of-state businesses and customers."

According to PacifiCorp, "Washington utilities that serve only or predominantly Washington customers do not have the same CCA compliance cost burden as PacifiCorp, which serves out-of-state customers with electricity from Chehalis," and "[t]hese protectionist effects and the explicit legislative text that the CCA shall be implemented to mitigate the cost burden for customers in Washington, and only in Washington, confirm that the CCA's allocation of no-cost allowances imposes Constitutionally impermissible burdens on interstate commerce."

PacifiCorp sought a motion for preliminary injunction to enjoin Ecology "from enforcing the no-cost allowance provisions of the CCA in a manner that discriminates between in-state and out-of-state customers."

The district court concluded that dismissal of PacifiCorp's Dormant Commerce Clause claims was warranted because "[t]he electricity PacifiCorp generates to send out of state is not substantially similar to the electricity it sells in Washington because the exported energy is not covered by" Washington's Clean Energy Transformation Act (CETA). *See* Wash. Rev. Code § 19.405. The district court opined that "[a]ccepting PacifiCorp's [Dormant Commerce Clause] argument would elevate the energy it produces in Washington but then sends out of state above Washington's entire regulatory framework for reducing carbon emissions: it would be exempt from both the decarbonization mandate of CETA *and* the purchase of allowances under the CCA." The district court observed that:

> Throughout PacifiCorp's complaint and description of how no-cost allowances under the CCA are allocated, there is not one mention of CETA's existence, despite the CCA and its implementing regulations making clear that an electric utility is only eligible for no-cost allowances to the extent that it is subject to CETA's requirements. But the existence of CETA, and its role in the allocation of no-cost allowances, is not an inconvenient fact that PacifiCorp can avoid by artful pleading.

The district court concluded that the CCA and CETA operate in tandem to reduce carbon emissions because:

> The CCA requires covered entities to buy allowances for carbon emissions, subject to a cap on allowances that decreases each year, so that market pressure will encourage those entities to decarbonize. But electric utilities serving Washington customers [do not] need that market pressure because CETA already requires them to decarbonize, and on a faster schedule. In contrast, the emissions that PacifiCorp generates within Washington's borders at its Chehalis plant, but uses to export electricity to customers in other states, are not covered by CETA at all. This fundamental difference in preexisting regulation means that the two categories of

emissions are not substantially similar for purposes of the Dormant Commerce Clause.

The district court also rejected PacifiCorp's reliance on Dormant Commerce Clause precedent involving the compensatory tax doctrine because "the CCA's allocation of no-cost allowances to utilities already subject to CETA's requirements is not the equivalent of a facially discriminatory tax." The district court clarified that the compensatory tax doctrine is "a specific way of justifying a facially discriminatory tax as achieving a legitimate local purpose that cannot be achieved through discriminatory means." *See Oregon Waste Sys. v. Dep't of Envt'l Qual. Of State of Or.*, 511 U.S. 93, 102 (1994). Rather than applying a discriminatory tax analysis, the district court determined that the relevant inquiry for this case is whether "the competing entities were subject to different regulatory regimes."

Finally, the district court opined that "the retail electric market in the United States is already the type of Balkanized system that the Dormant Commerce Clause in competitive markets serves to guard against—a fact acknowledged by both the Federal Power Act and the Supreme Court's Commerce Clause cases." *See e.g., Arkansas Elec. Coop. Corp. v. Ark. Pub. Svc. Com'n*, 461 U.S. 375, 395 (1983) ("[T]he national fabric does not seem to have been seriously disturbed by leaving regulation of retail utility rates largely to the States."); *see also Electric Pwr. Supply Ass'n v. Star*, 904 F.3d 518, 525 (7th Cir. 2018) ("Illinois has not engaged in any discrimination beyond what is required by the rule that a state must regulate within its borders. All carbon-emitting plants in Illinois need to buy credits."). The district court explained that "[u]nder this [balkanized] system,

PacifiCorp's retail electricity customers in Washington and other states do not compete in the way that typically triggers dormant Commerce Clause scrutiny.  If PacifiCorp succeeds in passing the compliance costs of the CCA on to its out-of-state customers, it will be because each state's utility commission has approved charging its own residents those rates."  On the other hand, "if PacifiCorp fails, then its shareholders will incur those costs not because they serve out-of-state customers, but because they own and operate a power plant in Washington state that produces emissions not already covered by CETA's decarbonization schedule—just like any other comparable covered entity under the CCA."

PacifiCorp did not seek leave to amend its complaint, and the district court dismissed PacifiCorp's complaint with prejudice because its "ruling [was] based on the plain text of the CCA and CETA and the way the statutes interact, rather than on insufficient factual allegations."  The district court also denied PacifiCorp's motion for preliminary injunction as moot.

PacifiCorp filed a timely notice of appeal.

## II.    STANDARDS OF REVIEW

"We review *de novo* a district court's dismissal under Fed. R. Civ. P. 12(b)(6), accepting as true all allegations of fact in a well-pleaded complaint and construing those facts in the light most favorable to the plaintiff." *DeFrancesco v. Robbins*, 136 F.4th 933, 938 (9th Cir. 2025) (citation and internal quotation marks omitted).

"Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment. . . ." *Webb v.*

*Trader Joe's Co.*, 999 F.3d 1196, 1204 (9th Cir. 2021) (citation omitted).

"The denial of a motion for preliminary injunction will be reversed only if the district court abused its discretion or based its decision on an erroneous legal premise. . . ." *F.T.C. v. Microsoft Corp.*, 136 F.4th 954, 964 (9th Cir. 2025) (citation omitted).

## III.    DISCUSSION

### A.  Standing and Ripeness of PacifiCorp's Claims

Ecology does not challenge the district court's rulings that PacifiCorp had standing to assert its Dormant Commerce Clause claim, and that the claim was ripe for adjudication.   Nevertheless, "[s]tanding is a threshold consideration that must be determined before considering the merits." *Day v. Henry*, 152 F.4th 961, 967 (9th Cir. 2025), *as amended*, (citation omitted).   For Article III standing, "a plaintiff must have (1) suffered an injury-in-fact that is (2) traceable to the defendant's challenged conduct, and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (citation omitted).   "[A] plaintiff satisfies redressability when he shows that a favorable decision will relieve a discrete injury to himself, not that a favorable decision will relieve his *every* injury. . . ."   *Id.* (citation and internal quotation marks omitted) (emphasis in the original).

The district court held that PacifiCorp had standing because "[t]he CCA requires PacifiCorp to obtain allowances for its Chehalis emissions, either through purchase at auction or the award of no-cost allowances," and "PacifiCorp . . .plausibly alleged that it will have to spend money to purchase allowances for the emissions generated

for exported electricity." The district court emphasized that, "[e]ven if PacifiCorp might eventually be allowed to pass those costs on to its customers, PacifiCorp remains the regulated entity required to obtain the allowances in the first place," resulting in "a sufficiently concrete and particularized injury for PacifiCorp to challenge the CCA's method of deciding when an electric utility must buy allowances rather than receive them for free."

We agree with the district court that PacifiCorp's "alleged injury is caused by the requirements of the challenged statute and it could be redressed by an injunction requiring Ecology to distribute no-cost allowances for exported electricity or exempting PacifiCorp from the purchase of allowances altogether." PacifiCorp's challenge to the manner in which Washington provided no-cost allowances was a sufficient injury-in-fact, and "the district court was capable of granting at least some relief" by enjoining "enforcement of the statutory scheme." *Day*, 152 F.4th at 968. "This solution would negate the Commerce Clause issue by eliminating enforcement of the allegedly discriminatory laws altogether. . . ." *Id.* (footnote reference omitted).

PacifiCorp's claims are also ripe. "For a suit to be ripe within the meaning of Article III, it must present concrete legal issues, presented in actual cases, not abstractions." *Planned Parenthood Great Nw. v. Labrador*, 122 F.4th 825, 839 (9th Cir. 2024) (citation and internal quotation marks omitted). "In many cases, the constitutional component of ripeness is synonymous with the injury-in-fact prong of the standing inquiry. . . ." *Id.* (citation and internal quotation marks omitted). The district court correctly held that "PacifiCorp's obligation to at least front the cost of allowances is identifiable and imminent," and that

"PacifiCorp's responsibility to bear the cost of CCA allowances—regardless of the results of its administrative appeals to pass on those costs to its customers—rebut[ted] Ecology's ripeness argument." *See id.*

## B. The District Court's Dismissal of PacifiCorp's Complaint

PacifiCorp contends that the district court erred in dismissing its complaint on the basis that PacifiCorp's respective generation of electricity under the CCA for in-state use and its generation of electricity for exportation were not similarly situated uses under the Dormant Commerce Clause.

The Commerce Clause provides that "[t]he Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. 1, § 8, cl. 3. "The negative reading of this clause—known as the dormant Commerce Clause— prevents states from adopting protectionist measures that unduly restrict interstate commerce. . . ." *Day*, 152 F.4th at 969 (citation and internal quotation marks omitted). "The first step in analyzing any law under the dormant Commerce Clause is to determine whether it regulates evenhandedly with only incidental effects on interstate commerce, or discriminates against interstate commerce." *Id.* at 970 (citation and internal quotation marks omitted). "Discrimination means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.* (citation and internal quotation marks omitted). "This differential treatment must be as between persons or entities who are similarly situated." *Id.* (citation and internal quotation marks omitted).

Consistent with "the Supreme Court's clear instruction . . . that extreme caution is warranted before a court deploys its implied authority to reject a state law under the dormant Commerce Clause," *Flynt v. Bonta*, 131 F.4th 918, 926 (9th Cir. 2025) (citation and internal quotation marks omitted), we conclude that the district court correctly dismissed PacifiCorp's Dormant Commerce Clause claims. In this case, the focus of the Dormant Commerce Clause analysis is not primarily on whether PacifiCorp produces the same product, specifically electricity, for in-state and out-of-state consumers. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127-28 (1978) (explaining that the Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations"). Rather, it is the regulatory distinctions between the treatment of entities that produce in-state electricity and exported electricity under the CCA and CETA that undermine PacifiCorp's contention that carbon emissions from its production of electricity for in-state and out-of-state customers are similarly situated for purposes of the Dormant Commerce Clause.[1]

In 2019, the Washington legislature adopted CETA to "address the impacts of climate change by leading the transition to a clean energy economy," and "to eliminate coal-fired electricity, transition the state's electricity supply to one hundred percent carbon-neutral by 2030, and one hundred percent carbon-free by 2045." Wash. Rev. Code

---

[1] Further complicating the Dormant Commerce Clause analysis in this case is the fact that PacifiCorp also sells electricity to Washington customers. PacifiCorp acknowledges that "CETA applies to gas-powered facilities like Chehalis," thus entitling PacifiCorp to receive no-cost allowances under the CCA for electricity sold to Washington customers. *See* Wash. Rev. Code § 70A.65.120(1).

§ 19.405.010(1)-(2).  To advance the state's decarbonization efforts, each electric utility was required to file a clean energy implementation plan with the Washington Utilities and Transportation Commission (Commission) by October 1. 2021, and every four years thereafter.  The clean energy implementation plan was to describe "the utility's plan for making progress toward meeting the clean energy transformation standards [as] informed by the utility's clean energy action plan."  Wash. Admin. Code 480-100-640(1).[2]

In 2021, the Washington legislature adopted "a cap on greenhouse gas emissions from covered entities and a program to track, verify, and enforce compliance through the use of compliance instruments," and imposed "[a]nnual allowance budgets that limit emissions from covered entities."  Wash. Rev. Code § 70A.65.060(1)-(2) (2021).  Under the CCA, a covered entity is one that "owns or operates a facility and the facility's emissions equal or exceed 25,000 metric tons of carbon dioxide equivalent."  Wash. Rev. Code § 70A.65.080(1)(a).  The CCA provides for allowances, which authorize the emission of "up to one metric ton of carbon dioxide equivalent."  Wash. Rev. Code

---

[2] In 2024, the Commission determined that PacifiCorp had not shown "meaningful progress towards meeting CETA standards," and ordered an investigation into PacifiCorp's CETA update. *Washington Utilities & Transp. Comm'n v. PacifiCorp*, No. UE-210829, 2024 WL 1364108, at *5 (Wash. U.T.C. Mar. 25, 2024).  The enforcement action against PacifiCorp and CETA's regulatory mandates undermine PacifiCorp's assertion that there are not two categories of emissions because CETA does not require utilities to be "greenhouse gas neutral" until 2030.  CETA does not apply to exported power, thus justifying denial of cost allowances for sale of electricity to out-of-state customers irrespective of the timing set by the Washington legislature for its decarbonization goals.

§ 70A.65.010(1). These allowances must be purchased at auction.

The CCA also contains a provision allowing electric utilities subject to CETA "to be eligible for allowance allocation . . . in order to mitigate cost burden of the [CETA] program on electricity customers." Wash. Rev. Code § 70A.65.120(1). Most of the covered entities obtain the required allowances by purchasing them at auctions conducted by Ecology. However, under the CCA, all electric utilities subject to the requirements of the 2019 CETA are eligible for no-cost allowances. *See* Wash. Rev. Code § 70A.65.120(i); *see also* Wash. Admin. Code § 173-446-530.

PacifiCorp is among the electric utilities eligible to receive no-cost allowances. Utilities such as PacifiCorp, which are subject to CETA, receive no-cost allowances for carbon emissions produced by electricity sold to Washington customers, but these utilities do not receive no-cost allowances for emissions from electricity that is not subjected to CETA's requirements, *i.e.*, electricity exported outside the State of Washington, and therefore not subject to CETA. *See id.* As the district court explained, "[t]he energy PacifiCorp produces for use in-state is subject to a preexisting, comprehensive regulatory regime—the Clean Energy Transformation Act—that its exported energy is not."

"[A]ny notion of discrimination [in violation of the Dormant Commerce Clause] assumes a comparison of substantially similar entities." *General Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997) (footnote reference omitted). The district court correctly concluded that, due to the separate emission mandates imposed by CETA and the

CCA, PacifiCorp was unable to plausibly allege that its carbon emissions resulting from in-state production of electricity and its carbon emissions emanating from its exported electricity were similarly situated for purposes of the Dormant Commerce Clause. As the district court explained,

> When the Washington legislature enacted the CCA, it was not writing on a blank slate. Because CETA already existed, the legislature faced a situation where a certain class of emitters otherwise subject to the CCA—electric utilities serving Washington residents—were already regulated by a separate and more aggressive decarbonization mandate. Rather than subject those utilities—including PacifiCorp—to overlapping sets of requirements, and potentially subject Washington's electric customers to unnecessary increased costs beyond what they already face under CETA, the legislature chose to issue no-cost CCA allowances to electric utilities to the extent that their emissions were already covered by CETA's decarbonization schedule.
>
> Although one would not learn it from reading PacifiCorp's complaint—which does not mention CETA at all, and instead frames the no-cost allowances as simply a giveaway to Washington customers—the connection between no-cost allowances for electric utilities and CETA's preexisting regulatory

regime is in the plain text of the CCA and its regulations.  The CCA's purpose of working in tandem with CETA's requirements, rather than just benefiting in-state customers, is reinforced by the statute phasing out the no-cost allowances by 2045, the same year that CETA's decarbonization mandate will be in full effect.

*See* Wash. Rev. Code § 70A.65.120(2)(d) ("Under no circumstances may utilities receive any free allowance after 2045.").

In sum, CETA requires electric utilities like PacifiCorp, that provide electricity to Washington customers to decarbonize their power generation, while emissions resulting from electricity produced for export to out-of-state customers are not covered by CETA.  These categories of emissions regulated in Washington are not substantially similar under the Dormant Commerce Clause, particularly as "[g]ranting PacifiCorp its requested relief would mean that the emissions it generates in Chehalis, but uses to export electricity, would be exempt from both CETA's decarbonization mandate and the CCA's requirement of purchasing emissions allowances."  Moreover, elimination of cost allowances for Washington customers and the allowances that PacifiCorp must purchase for its exported electricity "would not serve the dormant Commerce Clause's fundamental objective of preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors."  *General Motors*, 519 U.S. at 299.  Indeed, PacifiCorp's exported power is not similarly situated to utilities providing in-state power under CETA "for the

simple reason that . . . the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed." *Id.* Thus, Washington's "categorical distinction between" its regulatory treatment of emissions from entities providing in-state power under CETA and the lack of no-cost allowances in the CCA for emissions resulting from exported power produced by entities not providing in-state power under CETA is not "wholly illusory." *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 586 (1997).

Although PacifiCorp purports that it would face higher costs for its exported power, particularly as other states impose their own set of carbon emissions requirements, we have "rejected arguments that state laws treating out-of-state and in-state entities similarly, but which prevent them from structuring or operating their business as they prefer, reflect improper discrimination in favor of in state interests." *Flynt*, 131 F.4th at 927 (citations omitted). The Dormant Commerce Clause does not "protect the particular structure or methods of operation in a retail market." *Id.* at 928 (citation and alteration omitted). Moreover, "the dormant Commerce Clause does not impose a least burdensome requirement for state laws." *Association des Éleveurs de Canards et d'Oies du Québec v. Bonta*, 33 F.4th 1107, 1119 (9th Cir. 2022) (citation and internal quotation marks omitted).

Washington imposes different regulatory mandates for carbon emissions from electricity that is produced by PacifiCorp for use within the state, and carbon emissions from electricity produced for export. PacifiCorp's reliance on cases involving taxes imposed on out-of-state entities or the denial of tax exemptions for out-of-state entities is

misplaced.   In *Camps Newfound/Owatonna*, the Supreme Court considered "whether an otherwise generally applicable state property tax violate[d] the Commerce Clause . . . because its exemption for property owned by charitable institutions excludes organizations operated principally for the benefit of nonresidents."  520 U.S. at 567. The petitioner in that case "operate[d] a summer camp for the benefit of children of the Christian Science faith," and "[ab]out 95 percent of the campers [were] not residents of Maine."  *Id.*  Maine "provide[d] a general exemption from real estate and personal property taxes for benevolent and charitable institutions incorporated in the State."  *Id.* at 568 (internal quotation marks omitted).   "With respect to institutions that [were] in fact conducted or operated principally for the benefit of persons who [were] not residents of Maine, however, a charity [was able to] qualify for a more limited tax benefit, and then only if the weekly charge for services provided d[id] not exceed $30 per person."   *Id.* (citation, footnote reference, and internal quotation marks omitted).

The Supreme Court framed the issue as "the disparate real estate tax treatment of a nonprofit service provider based on the residence of the consumers that it serves."  *Id.* at 572. No issue was raised regarding whether the in-state and out-of-state entities were similarly situated under the Dormant Commerce Clause.  *See id.* at 587.  It is not surprising that there was no question of substantial similarity raised.  The only difference between the entities being considered for differing taxation treatment was whether the entity serviced in-state campers or out-of-state campers.  *See id.* at 575.  In contrast, the entities here are not similarly situated because they are subject to entirely different statutory schemes. Thus,   the   Supreme   Court's   decision   in   *Campus*

*Newfound/Owatonna* does not control the outcome of this case.**[3]**

Neither does the Supreme Court's decision in *Oregon Waste Sys.*, support PacifiCorp's contentions that emissions from in-state entities regulated by CETA and emissions from exported power that is not regulated by CETA are similarly situated under the Dormant Commerce Clause. In that case, the Supreme Court considered "whether Oregon's purportedly cost-based surcharge on the in-state disposal of solid waste generated in other States violate[d] the Commerce Clause." 511 U.S. at 95. The Supreme Court held that "[b]ecause [Oregon] offered no legitimate reason to subject waste generated in other States to a discriminatory surcharge approximately three times as high as that imposed on waste generated in Oregon, the surcharge [was] facially invalid under the negative Commerce Clause." *Id.* at 108.

---

[3] In its letter filed under Federal Rule of Appellate Procedure 28(j), PacifiCorp raised a potential issue under the Tax Injunction Act (TIA), 28 U.S.C. §1341. "The TIA precludes suits in federal court where the requested relief would to some degree stop the assessment or collection of a state tax. . . ." *Online Merchants Guild v. Maduros*, 52 F.4th 1048, 1051-52 (9th Cir. 2022) (citation and internal quotation marks omitted). PacifiCorp has pursued contradictory positions as to whether the costs imposed under the CCA and CETA qualify as taxes. For the first time in its reply brief, PacifiCorp asserts that it could amend its complaint to allege that the CCA's no-cost allowances are taxes on electricity that discriminate against out-of-state customers in violation of 15 U.S.C. §391. However, in its 28(j) letter, PacifiCorp maintains that the TIA should not apply "because the purpose of [the] allowances is to modify behavior (reduce emissions), not to raise revenue." Based on PacifiCorp's concession that the CCA imposes regulatory fees and costs to promote decarbonization efforts, as opposed to a state tax for revenue collection, the TIA does not apply, and any amendment premised on violation of 15 U.S.C. §391 would be futile.

Washington's decarbonization regime does not tax or impose a surcharge on electricity generated in other states and sold to Washington customers. Instead, Washington imposes different regulatory requirements for carbon emissions produced from electricity generated for in-state consumption and emissions produced from electricity generated for export. Thus, Washington's provision of no-cost allowances for carbon emissions produced by in-state entities covered under CETA, and its denial of no-cost allowances for entities that export power and are not subject to regulation under CETA do not involve "substantially similar entities." *General Motors*, 519 U.S. at 298.

We are persuaded by the Seventh Circuit's reasoning in *Electric Power Supply Association*, 904 F.3d 518. In that case, the Seventh Circuit considered a Dormant Commerce Clause challenge to legislation enacted in the State of Illinois to subsidize some of the state's nuclear generation facilities in the form of "zero emission credits." *Id.* at 521, 524. In affirming the district court's entry of summary judgment in favor of the State, the Seventh Circuit recounted the purpose of the Commerce Clause and its application to regulation of electricity by the several States. *See id.* at 524-25. In doing so the Seventh Circuit observed: "The commerce power belongs to Congress; the Supreme Court treats silence by Congress as preventing discriminatory state legislation." *Id.* at 525. The Seventh Circuit then clarified that Congress has not remained silent when it comes to regulation of electricity by the States. Rather, Congress specifically provided in the Federal Power Act, 16 U.S.C. § 824(b)(1) that States "may regulate local generation" of electric power. *Id.* Based on that rationale, the Seventh Circuit concluded that zero emission credits were not discriminatory under the

Commerce Clause. *See id.* Rather, they were a reflection of "the rule that a state must regulate within its borders." *Id.*

The same is true in this case. Legislators in the State of Washington promulgated a comprehensive statutory scheme to achieve its goal of reducing carbon emissions in the state. *See* Wash. Rev. Code §19.405.010. Washington's no-cost allowances are analogous to the zero emission credits considered by the Seventh Circuit in *Electric Power Supply Association*. Similarly to the rationale of the Seventh Circuit, limiting the no-cost allowances to providers that are subject to the requirements of the 2019 CETA requirements did not result in a violation of the Dormant Commerce Clause. *See id.*[4]

Finally, PacifiCorp's contention that the district court erred in dismissing its complaint without leave to amend is unpersuasive. PacifiCorp maintains that, even though it did not seek leave to amend in the district court, it could amend its complaint to allege that "(1) CETA's portfolio requirements, of which the Washington-allocated portion of Chehalis is a part, do not go into effect until 2030, and (2) other states have laws similar to CETA that apply to

---

[4] Reduced to its essence, the dissent is predicated on the notion that PacifiCorp, which exports power, is similarly situated to Washington utilities which do not export power. However, as discussed at length, these entities are subject to different regulatory schemes linked to the State of Washington's commitment to the reduction of greenhouse-gas emissions within the state. Non-exporting utilities are subject to the provisions of the CCA, which requires entities emitting greenhouse-gas within the state to obtain allowances to offset those emissions. Utilities like PacifiCorp that export power are subject to a different regulatory provision because the CCA does not apply to greenhouse-gas emissions outside the State of Washington. We are not persuaded that discovery is required to establish this obvious dissimilarity.

electricity from Chehalis for PacifiCorp customers in those states." PacifiCorp "did not request leave to amend from the district court, so we need not consider that argument on appeal." *Osheske v. Silver Cinemas Acquisition Co.*, 132 F.4th 1110, 1114 (9th Cir. 2025). In any event, "[t]he district court's dismissal without leave to amend was proper because it is clear, on *de novo* review, that the complaint could not be saved by any amendment." *Id.* (citation and internal quotation marks omitted). Because PacifiCorp failed to plead a plausible and legally tenable Dormant Commerce Clause claim, any amendment would be futile irrespective of PacifiCorp's newly-minted allegations. *See id.*

## C. The District Court's Denial of PacifiCorp's Motion For A Preliminary Injunction

PacifiCorp asserts that the district court abused its discretion in denying its motion for a preliminary injunction because it was likely to succeed on the merits of its Dormant Commerce Clause claim.

Because dismissal of PacifiCorp's Dormant Commerce Clause claim as a matter of law was warranted, the district court properly denied PacifiCorp's motion for a preliminary injunction as moot. *See Simon v. City & Cnty. of San Francisco*, 135 F.4th 784, 797 (9th Cir. 2025) (explaining that "[l]ikelihood of success on the merits is a threshold inquiry and is the most important factor" in determining whether a plaintiff is entitled to a preliminary injunction) (citation omitted); *see also Bayer v. Neiman Marcus Grp.*, 861 F.3d 853, 862 (9th Cir. 2017) (noting that a case is moot when a court is unable "to grant any effectual relief.").

## IV.  CONCLUSION

We have acknowledged that "[o]ur federal system recognizes each State's freedom to serve as a laboratory; and try novel social and economic experiments." *American Fuel & Petrochemical Mfrs. v. O'Keeffe*, 903 F.3d 903, 913 (9th Cir. 2018) (citation and internal quotation marks omitted). "This freedom would be meaningless if officials could not promote the economic benefits of these experiments to their states without running afoul of the Commerce Clause." *Id.* "It is well settled that the states have a legitimate interest in combating the adverse effects of climate change on their residents." *Id.* (citation omitted). "Air pollution prevention falls under the broad police powers of the states, which include the power to protect the health of citizens in the state." *Id.* (citation omitted). Consistent with these precepts, we hold that the district court's dismissal of PacifiCorp's complaint with prejudice was warranted because PacifiCorp failed to plausibly allege that Washington's decarbonization regulations and its use of no-cost allowances were applied to similarly situated entities as required for violations of the Dormant Commerce Clause. Because PacifiCorp is unable to plausibly allege a cognizable claim under the Dormant Commerce Clause, the district court did not err in dismissing PacifiCorp's complaint without leave to amend, and PacifiCorp's motion for preliminary injunction was correctly denied as moot.

**AFFIRMED.**

BRESS, Circuit Judge, dissenting:

Washington's Climate Commitment Act (CCA) requires all operators of facilities in Washington State that emit more than a certain amount of greenhouse gas to purchase allowances for their emissions. Wash. Rev. Code §§ 70A.65.010(1), 70A.65.060(1)–(2), 70A.65.080(1)(a). To ease the burden of CCA compliance on electricity customers, retail electric utilities are eligible for "no-cost allowances," *i.e.*, free credits. *Id.* § 70A.65.120(1). But utilities can only receive no-cost allowances in proportion to the electricity they sell to Washington electricity customers. *Id.* § 70A.65.010(21); Wash. Admin. Code § 173-446-230(2)(f). In other words, if a utility in Washington sells 90% of its electricity to out-of-state customers, only 10% of its emissions will be eligible for no-cost allowances under the CCA. On its face, the CCA thus facially discriminates against interstate commerce by imposing greater costs on interstate electricity sales through the disallowance of associated no-cost allowances. This is a significant problem for plaintiff PacifiCorp, which must buy expensive CCA allowances—estimated at approximately $48 million in 2024—for all out-of-state electricity sales from its Chehalis, Washington plant.

Absent anything further, the CCA's facial discrimination against interstate sales of electricity would violate the core antidiscrimination principle of the dormant Commerce Clause. But Washington has a response: it says the CCA provides electric utilities with no-cost allowances to compensate for the costs that another Washington law, the Clean Energy Transformation Act (CETA), Wash. Rev. Code § 19.405.010 *et seq.*, imposes on producers selling electricity into Washington. Because CETA does not apply to electricity sold to out-of-state customers, Washington

argues, the CCA's no-cost allowances for in-state electricity sales merely balance out CETA's burdens and place in-state and out-of-state electricity sales on equal footing.

That sounds sensible in theory, but under Supreme Court precedent, the key question is whether it is true in fact. And here, we do not have enough before us to say one way or the other. This case is only at the pleading stage, and we lack any record that would allow us to evaluate whether Washington is correct that the costs of the CCA and CETA merely offset each other, thereby justifying the CCA's facial discrimination against interstate commerce. And there are serious reasons to question Washington's argument, given the high immediate costs that the CCA imposes on PacifiCorp and the fact that CETA creates no immediate decarbonization obligations on gas-fired power plant operators until 2030. *See* Wash. Rev. Code § 19.405.040(1)(a). So the proper course here was to remand this case for factual development as to whether CETA's compliance costs and the CCA allowances are "roughly equivalent" in a way that would justify Washington's otherwise discriminatory treatment of interstate electricity sales. *See Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 103 (1994).

Like the district court, the majority opinion takes a very different path. It instead holds that the CCA's limitation of no-cost allowances to intrastate sales is entirely exempt from dormant Commerce Clause scrutiny because Washington's regulatory scheme renders electricity consumed in-state not "substantially similar" to electricity consumed out-of-state. *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997). That conclusion is mistaken as a matter of law. *Tracy* involved unique facts, and the case has rarely been applied since it

was decided nearly thirty years ago.  Nor did it apply here. Unlike *Tracy*, which involved different product markets and dissimilar sellers, the business entities subject to the CCA and CETA are the same—retail electric utilities, *i.e.*, utilities that sell electricity to residential customers.  Those entities all compete within the same product market—the retail electricity market.  And the underlying commodity sold within that market is the same—electricity.

By treating this case as outside dormant Commerce Clause scrutiny, the majority opinion improperly expands *Tracy*'s limited exception, which is only meant to permit differential treatment of entities that do not compete against each other (and in limited cases, those that do compete against each other but employ different business structures). *Tracy* has never been invoked—as the majority does here— to allow state regulation that increases the costs of intrastate commerce to justify facial discrimination against interstate commerce, without requiring any assessment of the degree to which interstate commerce is burdened.  Because the majority's expansion of *Tracy* would swallow the dormant Commerce Clause altogether, I respectfully dissent.

## I

In 2019, Washington enacted CETA to ensure that "all retail sales of electricity to Washington retail electric customers be greenhouse gas neutral by January 1, 2030." Wash. Rev. Code § 19.405.040(1).  However, the statute does not require utilities to demonstrate compliance with this neutrality standard until after 2030. *Id.* § 19.405.040(1)(A). Instead, in the interim, utilities only need to submit implementation plans with "specific targets for energy efficiency, demand response, and renewable energy," among other things. *Id.* § 19.405.060(1); Wash. Admin. Code

§ 480-100-640(1). CETA further mandates that by 2045, only electricity from renewable and non-greenhouse gas-generating sources may be used to supply retail electricity sold in-state. Wash. Rev. Code §§ 19.405.020(27), (33); 19.405.050(1). Because CETA's decarbonization requirements are tied to in-state retail electricity consumption (as opposed to in-state production), the statute does not impose any decarbonization mandates on electricity produced in-state but consumed out-of-state.

In 2021, two years after enacting CETA, Washington passed the CCA. The CCA requires that by 2030, 2040, and 2050, respectively, in-state greenhouse gas emissions should fall below 55%, 30%, and 5%, relative to in-state greenhouse gas emission levels from 1990. *Id.* § 70A.45.020(1)(a). To accomplish this goal, the CCA establishes a "cap and invest program" (also known as a cap-and-trade program) that requires the Washington State Department of Ecology (Ecology) to "implement a cap on greenhouse gas emissions from covered entities." *Id.* § 70A.65.060(1). Covered entities include any owner or operator of a power plant that emits at least 25,000 metric tons of carbon dioxide equivalent. *Id.* § 70A.65.080(1)(a).

The CCA's emissions cap is accomplished through the sale of "allowances"—*i.e.*, "authorization[s] to emit up to one metric ton of carbon dioxide equivalent." *Id.* § 70A.65.010(1). Specifically, the CCA's cap-and-invest program establishes quarterly "auctions" through which Ecology "distribute[s] allowances" for covered entities to purchase. *Id.* § 70A.65.100(1). If a covered entity emits greenhouse gases beyond the allowances that it has obtained, it must purchase and submit four penalty allowances for every one allowance exceeded. *Id.* § 70A.65.200(2). If the entity fails to submit penalty allowances, Ecology can issue

fines of "up to $10,000 per day per violation." *Id.* § 70A.65.200(3). Ecology is required to reduce the amount of allowances available for purchase every year, consistent with the CCA's emission reduction mandates. *Id.* § 70A.65.070(2).

Notably, however, the CCA also allows certain covered entities to obtain "no cost allowances" outside of the CCA's auction procedures. *See id.* §§ 70A.65.110–70A.65.130. Relevant here, the CCA awards no-cost allowances to retail electric utilities based on the amount of electricity sold subject to CETA. *Id.* § 70A.65.120(1). The stated purpose of these no-cost allowances is "to mitigate the cost burden of the [cap-and-invest] program on electricity customers." *Id.* Critically, however, the statute defines "cost burden" as "the impact on rates or charges to customers of electric utilities *in Washington state* . . . caused by the program." *Id.* § 70A.65.010(21), (59) (emphasis added). And Ecology's implementing regulations for the CCA establish a one-to-one ratio between the greenhouse gas emissions associated with retail electricity consumed in-state and the award of no-cost allowances to electric utilities. *See* Wash. Admin. Code § 173-446-230(2)(f). Therefore, the CCA only awards free allowances to electric utilities in direct proportion to how much electricity they provide to Washington residents. *Id.*; Wash. Rev. Code § 70A.65.010(21). As the district court explained, "[i]n practice, this means that the CCA provides electric utilities with no-cost allowances for the portion of their emissions that they forecast will be used to generate electricity sold to retail customers within Washington state."

The plaintiff in this case, PacifiCorp, is an Oregon corporation that provides retail electric utility service to approximately two million customers across six states in the West. Of PacifiCorp's two million customers, 140,000 are

located in Washington. PacifiCorp is one of three investor-owned electric utilities that compete in Washington's retail electricity market. The other two utilities are Avista, which, like PacifiCorp, sells electricity to both in-state and out-of-state customers, and Puget Sound Energy, which only does business in Washington. PacifiCorp owns and operates a gas-fired power plant in Chehalis, Washington, known as the Chehalis Generation Facility, or "Chehalis." Chehalis is a covered entity under the CCA.

About 23% of the electricity generated at Chehalis goes to Washington retail customers. Therefore, under the CCA, PacifiCorp receives no-cost allowances for 23% of the greenhouse gas emissions that it generates at Chehalis. *See* Wash. Rev. Code § 70A.65.120(2). But for the remaining 77% of greenhouse gas emissions that Chehalis produces, PacifiCorp does not receive free allowances. As a result, PacifiCorp estimates that it has incurred CCA compliance costs of $47.9 million in 2024 alone. Due to the costs imposed by the CCA, PacifiCorp represents that the Chehalis facility will no longer serve the interstate market starting in 2026.

II

I begin with how I would resolve this appeal. I then turn to why the majority opinion errs in concluding that the CCA's facial discrimination against interstate commerce is not even subject to dormant Commerce Clause review.

A

The Supreme Court has instructed that "'extreme caution is warranted before a court deploys' its 'implied authority' to reject a state law under the dormant Commerce Clause." *Flynt v. Bonta*, 131 F.4th 918, 926 (9th Cir. 2025) (quoting

*Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 390 (2023)).    That is particularly true for facially nondiscriminatory laws that merely have some effect on interstate commerce, or dormant Commerce Clause challenges that otherwise seek to expand this court-created doctrine.  *See, e.g.*, *Pork Producers*, 598 U.S. at 369; *Peridot Tree WA, Inc. v. Wash. State Liquor & Cannabis Control Bd.*, 162 F.4th 1179, 1185, 1888–89 (9th Cir. 2026).  But here, we are dealing with a state law that directly discriminates against interstate commerce.  *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 515 (2019).    This case therefore implicates the central antidiscrimination protections of the dormant Commerce Clause, which are "deeply rooted" in Supreme Court case law.  *Id.*  As a lower court, we are obligated to enforce these precedents.

The dormant Commerce Clause's foundational antidiscrimination principle protects against measures that benefit in-state economic interests over out-of-state competitors (which is not the specific concern here).  *See Pork Producers*, 598 U.S. at 369.  But this overarching principle also extends to discrimination against interstate commerce *itself*.  For as the Supreme Court has long emphasized, "[s]tate laws discriminating against interstate commerce on their face are virtually *per se* invalid."  *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 581 (1997) (quoting *Fulton Corp v. Faulkner*, 516 U.S. 325, 331 (1996)).  Indeed, discrimination against the enterprise of interstate commerce lies "at the very core of activities forbidden by the dormant Commerce Clause."  *Id.*; *see also Comptroller of Treas. of Md. v. Wynne*, 575 U.S. 542, 549 (2015) (explaining that "a State 'may not tax a transaction or incident more heavily when it crosses state

lines than when it occurs entirely within the State.'" (quoting *Armco Inc. v. Hardesty*, 467 U.S. 638, 642 (1984))); *Camps Newfound*, 520 U.S. at 581 (citing *Chemical Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 342 (1992)).

Here, Washington law plainly "discriminate[s] against an article of commerce by reason of its origin or destination out of State." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994). The CCA only awards no-cost allowances to retail electric utilities in direct proportion to how much electricity they sell to Washington residents. *See* Wash. Rev. Code § 70A.65.120(2); Wash. Admin. Code § 173-446-230(2)(f). The greater the proportion of out-of-state residents served by utilities like PacifiCorp, the higher the burdens of CCA compliance become. This is facial discrimination against interstate commerce. *See Camps Newfound*, 520 U.S. at 577–78 ("Economic protectionism is not limited to attempts to convey advantages on local merchants; it may include attempts to give local consumers an advantage over consumers in other States." (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 580 (1986))).

For instance, in *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, the Supreme Court held that a state could not "impos[e] a higher tax on a [business] that serves principally nonresidents than on one that limits its services primarily to residents." 520 U.S. at 575. The statute in question "expressly distinguishe[d] between entities that serve a principally interstate clientele and those that primarily serve an intrastate market, singling out [entities] that serve mostly in-staters for beneficial tax treatment, and penalizing those [entities] that do a principally interstate business." *Id.* at 576. As a result, "the statute encourage[d] affected entities to limit their out-of-state clientele, and

penalize[d] the principally nonresident customers of businesses catering to a primarily interstate market." *Id.* Such a law violated the dormant Commerce Clause's core antidiscrimination principle. *Id.* at 575–81.

Similarly, in *Fulton Corp v. Faulkner*, the Supreme Court rejected as facially discriminatory a statute that "taxed stock held by in-state shareholders only to the degree that its issuing corporation participates in interstate commerce," as the statute imposed taxes in direct proportion to how much of the corporations' business took place out of state. *Camps Newfound*, 520 U.S. at 578 (quoting *Fulton Corp.*, 516 U.S. at 333) (brackets omitted). As the Court explained, the law "tend[ed], at least, to discourage domestic corporations from plying their trades in interstate commerce," and was therefore presumptively invalid. *Fulton Corp.*, 516 U.S. at 333.

In this case, the CCA "expressly distinguishes between entities that serve a principally interstate clientele and those that primarily serve an intrastate market." *Camps Newfound*, 520 U.S. at 576. The statute also rewards with no-cost allowances those electric utilities "that serve mostly in-staters," while "penalizing" those utilities "that do a principally interstate business" by foisting the costs of the CCA upon them. *Id.* By imposing costs in direct proportion to an in-state utility's out-of-state business, the CCA "discourage[s] [retail electric utilities] from plying their trades in interstate commerce." *Fulton Corp.*, 516 U.S. at 333. This type of discrimination against interstate

commerce presumptively violates the dormant Commerce Clause.[1]

B

Because the CCA's award of no-cost allowances facially discriminates against retail electric utilities that serve out-of-state customers, it faces "a virtually *per se* rule of invalidity." *Granholm v. Heald*, 544 U.S. 460, 476 (2005) (quoting *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)). In limited circumstances, however, laws that discriminate against interstate commerce can be justified "as achieving a legitimate local purpose that cannot be achieved through nondiscriminatory means." *Oregon Waste*, 511 U.S. at 102.

Washington, throughout its briefing, attempts to justify its discrimination against interstate commerce by asserting that the purpose of the CCA is to "cover[ ] emissions associated with power that CETA does not reach, including power produced in Washington but exported out-of-state." Answering Br. at 1. In other words, in Washington's view, the CCA's burdens serve as a compensatory offset for the costs of CETA. As Washington tells us, "[t]he CCA's no-cost allowances harmonize the statute with CETA in an

---

[1] The majority cites *Elec. Power Supply Ass'n v. Star*, 904 F.3d 518 (7th Cir. 2018), for the proposition that states "may regulate local generation" of electric power. Maj. Op. at 22–23 (quoting *id.* at 525). But the Seventh Circuit emphasized that its decision did not extend to "express discrimination" against interstate commerce. *Star*, 904 F.3d at 525. *Star* therefore does not change the result: Washington's laws facially discriminate against utilities to the extent that their customers "come principally from other States." *Camps Newfound*, 520 U.S. at 572.

evenhanded manner that does not favor in-state interests at the expense of out-of-state interests."[2]  Answering Br. at 14.

The idea that a burden on interstate commerce is justified because it offsets intrastate costs is not a new one.  And when a state defends a discriminatory law on those grounds, Supreme Court precedent directs us to the dormant Commerce Clause's "compensatory tax doctrine."  *See Or. Waste Sys.*, 511 U.S. at 102–03; *see also Fulton*, 516 U.S. at 331–32; *Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 647–48 (1994); *Maryland v. Louisiana*, 451 U.S. 725, 728 (1981); *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 69–70 (1963).  Under this line of authority, which PacifiCorp invokes, a facially discriminatory tax on interstate commerce can be justified if it is "the rough equivalent of an identifiable and 'substantially similar' tax on intrastate commerce."  *Or. Waste Sys.*, 511 U.S. at 102–03 (quoting *Maryland*, 451 U.S. at 758–59).  For a discriminatory state law to be upheld under this doctrine,

---

[2] This basic argument is repeated throughout Washington's answering brief.  *See, e.g.*, Answering Br. at 26 (the purpose of the no-cost allowances is "to harmonize the burdens imposed under the CCA and CETA and to avoid a double-burden on in-state power that is already required to decarbonize"); Answering Br. at 27 (noting that "no-cost allowances harmonize two otherwise overlapping regulatory regimes"); Answering Br. at 29 (the "CCA recognizes that Washington retail power customers have a reduced relative ability to accommodate increased costs from decarbonization compared to out-of-state customers receiving power exempt from CETA's requirements" (quotation marks omitted)); Answering Br. at 34 ("But the CCA does not grant no-cost allowances to benefit in-state interests.  It grants them to avoid doubly burdening in-state retail power."); Answering Br. at 44 ("CETA is the express reason for the CCA's no-cost allowance system, and the two acts work together to achieve emissions reductions throughout Washington's power sector.").

"the tax on interstate commerce must be shown roughly to approximate—but not exceed—the amount of the tax on intrastate commerce." *Id.* at 103. In addition, "the events on which the interstate and intrastate taxes are imposed must be substantially equivalent; that is, they must be sufficiently similar in substance to serve as mutually exclusive proxies for each other." *Id.* (quotation marks and brackets omitted).

Washington's argument that the CCA's denial of no-cost allowances for out-of-state electricity sales merely balances out the burdens that CETA imposes on in-state consumers is conceivable. But the issue is not the potential plausibility of the theory, but its validity in fact. Given the current Rule 12(b)(6) posture, whether Washington can make the required showing under the compensatory tax doctrine is entirely unclear on the present record.

As an initial matter, for the compensatory tax doctrine to apply, "the events on which the interstate and intrastate taxes are imposed must be 'substantially equivalent.'" *Or. Waste Sys.*, 511 U.S. at 103 (quoting *Armco*, 467 U.S. at 643). Here, CETA imposes costs over time on in-state electricity through greenhouse gas-emission compliance requirements, whereas the CCA imposes one-time costs on exported electricity through the failure to award no-cost allowances. There is therefore a threshold question as to whether these are "substantially similar events" that are "mutually exclusive proxies for each other"—especially considering the Supreme Court's warning that courts should not "'plunge into the morass of weighing comparative tax burdens' by comparing taxes on dissimilar events." *Id.* at 104–05 (quoting *Am. Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 289 (1987) (alterations omitted)); *see also Fulton Corp.*, 516 U.S. at 338 (noting that besides the sales and use tax context, "our more recent cases have shown extreme

reluctance to recognize new compensatory categories"). Further factual development on this issue would be required in order to assess fully Washington's defense of the CCA.

But even if we assume that the two events are sufficiently similar, it would be premature to decide this question on a motion to dismiss, as we do not know if Washington's claimed CCA offset "approximate[s]" the costs of CETA compliance. *Or. Waste Sys.*, 511 U.S. at 103. The discriminatory tax system that the Supreme Court struck down in *Oregon Waste Systems* imposed a $2.25 per ton surcharge on out-of-state waste and a $0.85 per ton surcharge on in-state waste. *Id.* at 99. There is nothing in the record before us that quantifies and compares the respective costs that have already been imposed by CETA and the CCA and that will be imposed in the future. It is therefore unknown at this time whether the costs associated with CETA compliance and the denial of no-cost allowances under the CCA are roughly equivalent.

This is a complicated question that requires fact and expert discovery. For instance, utilities can satisfy CETA's "greenhouse gas neutrality" requirement through many means, such as switching to non-emitting generation, obtaining and using renewable energy credits, investing in energy transformation projects, or making compliance payments. *See* Wash. Rev. Code § 19.405.040. Each of these methods are likely associated with different costs, which are incurred over several decades and may vary each year as the deadline for compliance approaches. For instance, before 2030, utilities do not need to demonstrate compliance with CETA's greenhouse gas neutrality requirement—they only need to submit implementation plans outlining how they plan to achieve compliance post-2030. *Id.* § 19.405.060(1). And as PacifiCorp points out,

the costs of complying with and implementing CETA post-2030 are capped at a 2% increase over the utility's revenue in the previous year.  *Id.* § 19.405.060(3)(a).

Here, at this preliminary stage, Washington has presented nothing that would allow us to evaluate the comparative costs of complying with CETA and the CCA, other than the state's repeated representations that the CCA was meant to compensate for the costs of complying with CETA.  But Supreme Court precedent does not permit us to decide the compensatory offset question on Washington's mere say-so.  The majority opinion claims, without analysis, that because "CETA does not apply to exported power," this "justif[ies] denial of cost allowances for sale of electricity to out-of-state customers."  Maj. Op. at 15 n.2.  But there is no basis for this assertion.  No factual inquiry has been made on this critical issue (and as explained next, the majority opinion's rule of decision avoids that inquiry by design).

Accordingly, Washington's motion to dismiss should have been denied.

## III

## A

Like the district court, the majority opinion chooses a very different path.  It ignores the Supreme Court's well-trodden facial discrimination precedents to deploy a novel theory that allows Washington to avoid dormant Commerce Clause scrutiny entirely.   In the majority's view, "PacifiCorp's exported power is not similarly situated to utilities providing in-state power under CETA 'for the simple reason that . . . the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed.'"  Maj. Op. at 18–19

(quoting *Tracy*, 519 U.S. at 299). From this premise, the majority opinion effectively blesses *any* differential treatment against interstate commerce by the CCA, regardless of the magnitude.

This flawed theory rests on an improper expansion of *Tracy*'s similarly-situated-entities test. The point of *Tracy*'s rarely invoked exception is to prevent application of the dormant Commerce Clause to market participants that do not compete with each other in the same product market— because in that situation, there is no national market for competition for the dormant Commerce Clause to protect. Contrary to the majority's view, *Tracy* has never exempted from dormant Commerce Clause scrutiny laws that facially discriminate against interstate commerce as to the same product sold in the same product market, in transactions between similarly situated buyers and sellers, based solely on the supposedly greater costs that state regulation imposes on in-state sales. Indeed, by treating in-state and out-of-state electricity sales as differently situated based on their export destination, the majority's novel extension of *Tracy* is contrary to the logic of the dormant Commerce Clause itself.

Examining *Tracy* in detail demonstrates the majority's error. In *Tracy*, the Supreme Court considered an Ohio law that exempted from the state's general sales and use taxes purchases of gas from in-state natural gas utilities—known as local distribution companies, or LDCs. *See Tracy*, 519 U.S. at 281–82. The LDCs were all located in Ohio. *Id.* at 288. But the state did not exempt "non-LDC gas sellers, such as producers and independent marketers," from the tax. *Id.* at 282–83. General Motors, which purchased "virtually all the natural gas for its Ohio plants from out-of-state marketers," was therefore required to pay Ohio's general use tax for non-LDC gas purchases. *Id.* at 285. General Motors

sued, alleging that the dormant Commerce Clause invalidated the LDC tax exemption.

The Supreme Court rejected General Motors' argument and held that the dormant Commerce Clause did not apply. The Court reasoned that "any notion of discrimination assumes a comparison of substantially similar entities," and LDCs and non-LDC sellers were "different entities" that "provide different products" and "serve different markets." *Id.* at 298–99. In particular, following a detailed background discussion of the history of natural gas consumption and regulation, the Supreme Court found that there were two distinct classes of natural gas consumers in Ohio, served by two distinct sets of natural gas providers. The first class of consumers was "typified by residential consumers," who were "small, captive users" of natural gas who did not have "high volume requirements." *Id.* at 301–02. These consumers had a need for "bundled" natural gas services, which included transportation of the gas to their homes and other protections, such as the steady supply of gas at a stable rate during winter. *Id.* at 283, 297, 306; *see also id.* at 301 ("These are buyers who live on sufficiently tight budgets to make the stability of rate important, and who cannot readily bear the risk of losing a fuel supply in harsh natural or economic weather."). The second class of consumers was comprised of "bulk buyers" like General Motors, "large commercial and industrial users" who had high-volume needs and financial wherewithal to buy natural gas wholesale from private marketers on a less regulated interstate market. *Id.* at 302–03.

The Supreme Court explained how Ohio's regulatory decisions were built on—and further deepened—this existing divide in the market. As the Court noted, LDCs, as public utilities, were subject to extensive state regulation to

ensure that the needs of the residential consumer market were satisfied. *See id.* at 296–97; *see also id.* at 310 (describing the state regulation as "Ohio's regulatory response to the needs of the local natural gas market"). For instance, LDCs could only charge "just and reasonable rates," comprised of "a single average cost of gas . . . together with a limited return on investment." *Id.* at 296. They "could not exact a greater or lesser compensation for any services rendered than exacted from any other customer" for similar services. *Id.* at 297 (citation and alterations omitted). And they were required "to serve all members of the public, without discrimination," "to provide a firm backup supply of gas," and to "administer specific protective schemes" to help low-income customers. *Id.* In contrast, natural gas from non-LDC sellers came with none of those services and protections. *See id.* at 284–85. In short, LDCs and non-LDC sellers served different types of customers with different needs by providing different services with different regulatory protections for end-users of natural gas.

In light of these differences, *Tracy* concluded that the market for natural gas in Ohio was actually comprised of two separate markets for two "different products": "a product consisting of gas bundled with . . . services and protections," provided by LDCs, and an "unbundled gas" product without such protections, provided by non-LDC independent marketers. *Id.* at 297–99. This "difference in products," in turn, "mean[t] that the different entities"—LDCs and non-LDC marketers—were not "similarly situated" because they "serve[d] different markets, and would continue to do so even if the supposedly discriminatory [tax] burden were removed." *Id.* at 299. Therefore, given the "absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market," the

dormant Commerce Clause—which "serve[s] the . . . fundamental objective of preserving a national market for competition"—"ha[d] no job to do." *Id.* at 299–300, 303.

As *Tracy* underscores, the similarly-situated entities test only comes into play "when the allegedly competing entities provide different products," and asks whether "the difference in products may mean that the different entities serve different markets." *Tracy*, 519 U.S. at 298–99. Even though the LDCs and non-LDC sellers provided the same commodity (natural gas), based on the underlying consumer needs and supportive regulatory outgrowth, there were two distinct product markets in Ohio for bundled and unbundled natural gas distribution services.

It is telling that although the dormant Commerce Clause is a heavily litigated area, very few cases have applied *Tracy*'s exception (and none in the way the majority does here). In fact, in the nearly thirty years since *Tracy* was decided, the Supreme Court has mostly cited the case for other basic propositions of dormant Commerce Clause doctrine or oil and gas law. The most significant application of *Tracy* may be found in *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330 (2007), a decision that only highlights the limits of *Tracy*'s exception.

In *United Haulers*, the Supreme Court examined a challenge to two New York counties' "flow control" ordinances, which required that "all solid waste generated within the Counties be delivered to . . . processing sites" run by the counties' public waste disposal authority. *Id.* at 336. The Court applied *Tracy*, holding that there was no impermissible discrimination against interstate commerce because "[t]he flow control ordinances in this case benefit a

clearly public facility, while treating all private companies exactly the same." *Id.* at 342. As the Supreme Court explained, "[u]nlike private enterprise, government is vested with the responsibility of protecting the health, safety, and welfare of its citizens," and "[t]hese important responsibilities set state and local government apart from a typical private business." *Id.* at 342–43. *United Haulers* is simply a straightforward application of *Tracy*, because it is obvious that states and municipalities are not "substantially similar entities" to "private businesses." *Id.* at 342 (quoting *Tracy*, 519 U.S. at 298); *see also Nat'l Ass'n of Optometrists & Opticians v. Brown* (*LensCrafters*), 567 F.3d 521, 527 (9th Cir. 2009) (explaining that under *Tracy*, "competing in the same market is not sufficient to conclude that entities are similarly situated" because "states may legitimately distinguish between business structures in a retail market").

*Tracy* and its (limited) progeny therefore establish the following principle: when determining whether two comparator entities are "substantially similar" in dormant Commerce Clause cases, we must ask whether there is "actual or prospective competition between the supposedly favored and disfavored entities in a single market"— meaning a single product market. *Tracy*, 519 U.S. at 300; *see also id.* at 299 ("[T]he difference in products may mean that the different entities serve different markets."). If so, the entities are presumed to be similarly situated, although we must also consider the entity's "structure" or "method[ ] of operation" because it is permissible for a state to discriminate between market participants on those grounds, *LensCrafters*, 567 F.3d at 527, including, most obviously, when the state or local government itself has taken over the market, *see United Haulers*, 550 U.S. at 342–45.

### B

Armed with the proper inquiry under *Tracy*, it becomes apparent why the majority's "substantial similarity" reasoning cannot stand.

It is undisputed that PacifiCorp competes with Avista, Puget Sound Energy, and out-of-state utilities in the same product market: retail electricity. All of the in-state utilities are investor-owned utilities—none are publicly-owned, *see United Haulers*, 550 U.S. at 342–44, or otherwise differently structured, *see Exxon*, 437 U.S. at 127; *LensCrafters*, 567 F.3d at 527. And unlike in *Tracy*, where different regulatory regimes meant that LDC and non-LDC sellers served different product markets, all in-state utilities serving retail electricity consumers are subject to the same regulatory frameworks.

The majority nevertheless maintains that "the regulatory distinctions between the treatment of entities that produce in-state electricity and exported electricity under the CCA and CETA . . . undermine PacifiCorp's contention that carbon emissions from its production of electricity for in-state and out-of-state customers are similarly situated." Maj. Op. at 14. That is not correct. Under CETA, if a utility serves in-state consumers, "all retail sales of electricity to Washington retail electric customers [must] be greenhouse gas neutral by January 1, 2030." Wash. Rev. Code § 19.405.040(1). And similarly, Washington represents that "the CCA treats in-state and out-of-of state utilities identically for both the compliance obligation arising from their emissions at power plants in Washington and associated with imported power, as well as their eligibility for no-cost allowances." *See id.* §§ 70A.65.010(19), (21), (23), (27), (38), (42), 70A.65.060–70A.65.080; Wash. Admin. Code § 173-446-

230. In other words, all retail electric utilities located in Washington and serving Washington retail consumers are subject to both CETA and the CCA. The only difference is the allocation of no-cost CCA allowances based on the proportion of out-of-state customers served by each utility. Wash. Admin. Code § 173-446-230; Wash. Rev. Code § 70A.65.010(21). That is a difference in the application of the same regulatory framework depending on the amount of interstate commerce in which a retail utility engages. It is not a difference in the regulatory regime itself.

CETA did not eliminate actual, let alone prospective, competition between PacifiCorp and its competitors in either the Washington or out-of-state retail electricity markets. *See Tracy*, 519 U.S. at 300. Contra *Tracy*, there are not two distinct markets for electricity. Even after CETA went into effect, electricity from Chehalis competed in the Washington retail electricity market and out-of-state retail electricity markets with electricity from Puget Sound Energy, Avista, and importers. Unlike the LDC regulations in *Tracy*, which reinforced the separate retail and wholesale markets for natural gas, CETA did not fragment the retail electricity market (either in Washington or out of state) into two distinct product markets. *See Tracy*, 519 U.S. at 301. Therefore, even with CETA, PacifiCorp and its competitors are similarly situated because "their products compete against each other in a single market"—the retail electricity product market. *Rocky Mt. Farmers Union v. Corey*, 730 F.3d 1070, 1088 (9th Cir. 2013) (citing *Tracy*, 519 U.S. at 299). Washington is not engaging in the differential treatment of differently situated entities, but rather the differential treatment of a *product*—retail electricity—based on whether it enters interstate commerce. That takes this case far outside the scope of *Tracy*.

The majority's analysis muddles the *Tracy* test by treating the relevant comparator entities in an impossibly fluid way, shifting from "carbon emissions" to "exported power" to "utilities providing in-state power." Maj. Op. at 17–19. The majority opinion apparently compares "exported power" to "utilities providing in-state power," Maj. Op. at 18–19—a comparison that does not track *Tracy*'s focus on "substantially similar *entities*." 519 U.S. at 298 (emphasis added). What I take the majority to mean is that power exported out of state is differently situated from power dispatched to and consumed in Washington because Washington-bound power is regulated by CETA, while exported power is not. By this logic, the two "serve different markets, and would continue to do so even if the supposedly discriminatory burden"—the no-cost allowances—"were removed," Maj. Op. at 18–19 (quoting *Tracy*, 519 U.S. at 299), because Washington customers can only be served by CETA-compliant power.

But this analysis improperly collapses two different market concepts into one. Although PacifiCorp and its competitors serve different *geographic* markets (*i.e.*, the in-state and out-of-state markets), they compete in the same *product* market for retail electricity. In effect, then, the majority refashions the *Tracy* test to apply to the same product sold across multiple geographic markets, based on regulations (here, CETA) that increase the cost of in-state sales. Maj. Op. at 18–19.

But *Tracy* never concluded that products in the same product market could be differently situated based on either the geographic markets in which they are sold and consumed, the costs of in-state production, or whether the products are differently regulated in different states. *Cf. Tracy*, 519 U.S. at 300. And for good reason: such an

expansion of *Tracy* would contradict the fundamental logic of the dormant Commerce Clause itself. The premise of the dormant Commerce Clause is that there should be "a national market free from local legislation that discriminates in favor of local interests." *C & A Carbone*, 511 U.S. at 393. Even though different states may constitute different geographic markets in the economic sense, the dormant Commerce Clause forbids discrimination because of those differences. It would be illogical for *Tracy*'s similarly-situated entities exception to immunize laws that regulate the same product differently based on where it is sold or purchased, when the point of the dormant Commerce Clause is to prevent discrimination based on those distinctions. *See id.* at 390 (underscoring that a state cannot "impose commercial barriers or discriminate against an article of commerce by reason of its origin or destination out of State").

Extending *Tracy* to products sold in different geographic markets—instead of using it to determine whether two entities compete in the same product market—creates untenable results. All a state must do to escape dormant Commerce Clause scrutiny is apply some sort of regulatory framework to in-state sales of a product, which would in turn make it substantially different from out-of-state sales, which could then be burdened without limitation under the logic of the majority opinion. That contradicts Supreme Court precedent, which has repeatedly found dormant Commerce Clause violations even in industries characterized by "a patchwork of regional and state systems that lack comprehensive federal regulations or national uniformity." *See, e.g.*, *C & A Carbone*, 511 U.S. at 394 (solid waste disposal); *New England Power Co. v. New Hampshire*, 455

U.S. 331, 334 (1982) (hydroelectricity); *Maryland*, 451 U.S. at 728 (natural gas).

Indeed, under the majority's theory of the case, nothing would stop other states with decarbonization mandates from imposing their own discriminatory taxes on exported electricity without any dormant Commerce Clause review. As the Supreme Court has emphasized, "[a]voiding this sort of 'economic Balkanization,' and the retaliatory acts of other States that may follow, is one of the central purposes of our negative Commerce Clause jurisprudence." *Camps Newfound*, 520 U.S. at 577 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979)). *Tracy* has been on the books for nearly three decades, but it has never been understood in the far-reaching way the majority opinion deploys it today.

C

But even if we follow the majority opinion's flawed understanding of *Tracy* and conclude that the similarly-situated entities test can be directly applied to products based on whether they are sold in-state or out-of-state, CETA still does not render retail electricity consumed in-state substantially different from electricity consumed out-of-state. Here, the exact same electricity is dispatched to either Washington consumers or out-of-state consumers based on demand and the marginal cost of generation. *See Kootenai Elec. Co-op., Inc. v. FERC*, 192 F.3d 144, 148 (D.C. Cir. 1999) (noting that "[p]ower is fungible"). And unlike in *Tracy*, the utilities' customers, as retail electricity users, all have the same purchasing needs. *Cf. Tracy*, 519 U.S. at 301 (non-LDCs "did not serve the Ohio LDCs' core market of small, captive users"). There is a facial similarity to *Tracy* in that both cases involve an underlying commodity. But the Supreme Court's extensive discussion of the natural gas

market in *Tracy* shows that the similarities stop there, because *Tracy* involved two distinct product markets in a way this case does not.

While the majority opinion maintains that CETA is a "comprehensive statutory scheme" meant to enforce a "separate and more aggressive decarbonization mandate," Maj. Op. at 17, 23, that is immaterial here. The practical effect of CETA's mandate is to increase the marginal cost of generating electricity for Washington consumers by imposing additional compliance costs on utilities. In other words, the only difference between electricity dispatched in-state and out-of-state is, functionally, the cost of generating it. As PacifiCorp points out, it is "not possible to track electrons for purposes of determining what customers are ultimately served by Chehalis-produced power."

No precedent suggests that cost-input differences driven by state regulation can turn one product into two differently-situated products for dormant Commerce Clause purposes. Nor does it matter here that the allegedly more costly CETA-compliant energy will be produced through cleaner "green energy" processes. As we have explained, under *Tracy*, "[e]ntities are similarly situated for constitutional purposes if their products compete against each other in a single market," and "[i]f they do, it is irrelevant whether they are made from different materials." *Rocky Mt. Farmers Union*, 730 F.3d at 1088. *Tracy* has never been thought to immunize from dormant Commerce Clause scrutiny laws that facially discriminate against interstate commerce based on the supposedly higher in-state costs of production or distribution of the same product sold in the same product market.

The majority's contention that exported electricity from Chehalis "would continue to [serve separate markets,] even

if the supposedly discriminatory burden were removed," is therefore untrue.  Maj. Op. at 18–19 (quoting *Tracy*, 519 U.S. at 299).  Again, part of the reason that Chehalis-generated electricity can serve different markets is due to the marginal cost of distribution to each state, and CETA and the CCA simply increase those costs for electricity sent in-state and out-of-state, respectively.  The "discriminatory burden" imposed by the CCA can and will impact the provision of electricity services to out-of-state markets.  Indeed, we are told that the increased compliance costs imposed by the CCA are already poised to drive Chehalis out of the interstate market.

The majority also asserts that "granting PacifiCorp its requested relief would mean that the emissions it generates in Chehalis, but uses to export electricity, would be exempt from both CETA's decarbonization mandate and the CCA's requirement of purchasing emissions allowances."  Maj. Op. at 18 (brackets omitted).  That is not correct.  PacifiCorp is not entitled to any exemption per se; it is entitled to non-discriminatory treatment.

Of course, Washington strenuously argues that PacifiCorp *is* receiving that very treatment because the CCA's no-cost allowances merely balance out the costs of CETA for in-state electricity sales.  But as I have explained, that is the critical unresolved question in this case—one the majority avoids by treating this case as falling within *Tracy*'s limited exception.  In blessing Washington's scheme without further inquiry, the majority misapplies *Tracy* to create a never-before-seen exception to the dormant Commerce Clause that not only insulates Washington's facially discriminatory law from any constitutional scrutiny, but also circumvents the carefully tailored compensatory tax doctrine that is meant for this type of situation.  Because the

majority opinion departs from the Supreme Court's dormant Commerce Clause precedent, I respectfully dissent.